IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 17-cv-02369-RBJ

DEBRA HOCK,

     Plaintiff,

v.

MESA COUNTY VALLEY SCHOOL DISTRICT 51,

     Defendant.

---

### ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

In this disability discrimination lawsuit, defendant Mesa County Valley School District 51 ("District 51") moves for summary judgment. ECF No. 30. For the reasons stated herein, the motion is GRANTED in part and DENIED in part.

## I. BACKGROUND

Ms. Hock worked for District 51 from 1995 until her termination in May 2016. First Amended Complaint ("complaint"), ECF No. 11 at ¶¶5, 80. For the first 19 years of her tenure, she worked as a health assistant at Bookcliff Middle School. *Id.* at ¶¶5, 32. It is in this role and at this school that Ms. Hock sustained her first work-related injury to her left knee. *See id.* at ¶¶10–20. On May 7, 2014 Ms. Hock tested a diabetic student's blood sugar levels and found the levels to be too high. *Id.* at ¶7. Due to school policy, Ms. Hock could not treat the student without permission from either the school's registered nurse or the student's parent. *Id.* at ¶8. While Ms. Hock waited for guidance, the school contacted the student's mother. *Id.* at ¶10. Apparently unhappy with the situation, the student's mother "stormed into Ms. Hock's office yelling" and "proceeded to run into/slam into Ms. Hock." *Id.* at ¶¶10–11. Ms. Hock escaped

from her office, and the school notified the Grand Junction police. *Id.* at ¶¶12–17. Immediately following the incident and in the following days, Ms. Hock indicated that she wished to press charges. *Id.* at ¶¶15–18. However, the on-scene officer and Bookcliff principal dissuaded her from taking such action. *Id.*

A few days later, the diabetic student's mother met with unnamed school officials. *Id.* at ¶22. Although the contents of the meeting were unknown to Ms. Hock, the principal emailed Ms. Hock about the meeting and mentioned that there would be no further issues with this parent. *Id.* Ms. Hock asked the principal whether the parent would face consequence for her assault. *Id.* at ¶23. The principal responded, "we'll figure it out over the summer." *Id.* Angered by this response, Ms. Hock received permission to go home for the day. *Id.* While at home, Ms. Hock remembered that she had an appointment the following morning and would need to miss another day of work. *Id.* at ¶25. She emailed the registered nurse and received permission to miss work the next day. *Id.*

When Ms. Hock returned to work on May 15, 2014 after missing these two days, the principal and vice principal presented her with a FRISK notice, which is a written reprimand for unsatisfactory performance. *Id.* at ¶26. The notice cited the missed days of work as the primary reason for the reprimand. *Id.* at ¶27. Ms. Hock initially refused to sign the notice, but she signed it the following day after meeting with a District 51 human resource ("HR") specialist. *Id.* at ¶¶28–30. She also submitted a rebuttal to the notice. *Id.* at ¶30. Notwithstanding the FRISK notice incident, Ms. Hock believed she would be assigned the same position at Bookcliff Middle School the following school year. *Id.* at ¶¶31, 36.

However, in July 2014, District 51 notified Ms. Hock that she would be transferred to Pear Park Elementary School for the 2014–2015 school year to hold the dual positions of

kindergarten classroom paraprofessional and clerical office employee. *Id.* at ¶¶32, 36. The stated reason for the transfer was to "keep [her] safe," which Ms. Hock believed was in reference to the assaultive parent. *Id.* at ¶32. Although this transfer was temporary, it was against her will. *Id.* at ¶36. Moreover, Ms. Hock raised concerns that her physical limitations—she could not stand or walk for more than an hour and she was not able to climb, squat, kneel, or crawl— prevented her from performing the physical requirements of a kindergarten classroom paraprofessional. *Id.* at ¶¶33, 39.

According to Ms. Hock, District 51 assigned her to these two positions because it felt that it "could temporarily accommodate her with the work restrictions she had placed on her by her physician." *Id.* at ¶38. Ms. Hock remained concerned that she could not fulfil the position of kindergarten classroom paraprofessional due to her restrictions, but she accepted the position at Pear Park Elementary anyway and started work in the fall because District 51 assured her that her needs would be accommodated. *Id.* at ¶¶39–40. During this time, Ms. Hock continued to see her physician and keep District 51 and the Pear Park principal informed of her work restrictions due to her left knee injury. *Id.* at ¶¶41–42.

Toward the end of the 2014–2015 school year, the Pear Park principal, Dan Bunnell, informed Ms. Hock that he planned to eliminate the hours that she was working as a clerical office employee for the principal, but he allowed her to continue to work a half-day position as a kindergarten classroom paraprofessional. *Id.* at ¶47. Around this same time, Ms. Hock received a performance review from the principal. *Id.* at ¶48. The principal rated her performance as "satisfactory" or "proficient" in all but two aspects. *Id.* She received a FRISK notice for these two negative aspects, which were unspecified in the complaint. *Id.* at ¶49. Finally, Ms. Hock's physician notified her in May 2015 that she would eventually need a knee replacement. *Id.* at

¶51.

In the summer of 2015, Ms. Hock learned that she would be placed back at Pear Park Elementary. *Id.* at ¶54. District 51 planned to reassign her to the kindergarten classroom in the morning, but her afternoon position was yet to be determined. *Id.* Eventually, the principal informed Ms. Hock that a special education ("SpEd") paraprofessional position was available, and after a discussion about her physical restrictions, Ms. Hock accepted the position for the 2015–2016 school year. *Id.* at ¶¶55–56.

On August 5, 2015, the second day of school, Ms. Hock reinjured her knee when she chased after a special needs student who was running toward the parking lot. *Id.* at ¶57. She completed an injury report and sought workers' compensation benefits. *Id.* at ¶58. District 51 denied the workers' compensation claim because it determined that she simply reaggravated a preexisting injury. *Id.* at ¶¶59–60.

Following the injury, Ms. Hock visited her primary care physician and remained out of work for a month. *Id.* at ¶61. She returned to work on September 2, 2015 with the approval of her physician. *Id.* at ¶¶61–62. After providing the principal a list of physical restrictions, the principal sent her home because there was nothing that she could do with the physician-imposed restrictions. *Id.* The following day, a human resources employee for the District emailed Ms. Hock asking her to provide an updated doctor's note on her anticipated return date. *Id.* at ¶64. Although not explicitly stated in the complaint, it appears that she did not provide this information because "she had provided a doctor's note on September 2, 2015" which stated that her knee injury would last approximately one to three months. *Id.*

On September 25, 2015 Ms. Hock emailed the HR department to ask when she would be permitted to return to work. *Id.* at ¶65. An HR employee responded that it would be happy to

discuss a return date once she received notice from plaintiff's physician that she could return to work. *Id.* Another month went by. On October 20, 2015 an HR representative contacted Ms. Hock asking for an approximate return-to-work date. *Id.* at ¶67. She responded on October 26 and inquired what further information she needed to provide that her September 2 doctor's note failed to provide. *Id.* at ¶68. Nonetheless, Ms. Hock saw her physician on October 27 and obtained permission to return to work that day with her same physical restrictions: no kneeling, no running, no climbing, no squatting, no stairs, and no lifting over ten pounds. *Id.* at ¶69. She provided the note to the HR department. *Id.* at ¶70.

In response to the newest doctor's note, on November 6, 2015 the District's executive director of HR wrote in a letter that it had determined that Ms. Hock was unable to perform the essential functions of a SpEd paraprofessional, and that the District could not accommodate her physical limitations. *Id.* at ¶71. She also received a medical questionnaire for her physician to complete. *Id.* at ¶72. While she objected to the questionnaire because it asked about any mental impairments that she may have, the complaint never alleges that she voiced her objection to District 51. *Id.* Specifically, the question she opposed asked, "Describe any physical or mental impairments that would affect Ms. Hock's ability to perform the job of Special Education Paraprofessional." ECF No. 35-12 at 1. The complaint goes on to describe a few emails between Ms. Hock and the District regarding her leave benefits, but there are no alleged communications regarding the status of her employment until she emailed the District 51 Superintendent on April 5, 2016. *See* ECF No. 11 at ¶¶73–75.

On April 15, 2016 an HR representative responded to her April 5 email stating, "Ms. Hock had been recommended for dismissal from her employment with District 51." *Id.* at ¶76. In May, per the District's policy, she met with HR personnel to discuss her pending termination.

*Id.* at ¶¶78–79.  Despite her explanation about her knee injury, on May 27, 2016, "Ms. Hock received correspondence stating that her employment with District 51 was going to be terminated since she had failed to appear for work at Pear Park Elementary, that she had not provided requested information to District 51, and that she had made two (2) unsubstantiated workers' compensation claims."[1]  *Id.* at ¶80.  Ms. Hock appealed her termination.  *Id.* at ¶82

District 51 granted her appeal request, and it retained Michael Santo, a local Grand Junction attorney, to act as the hearing officer.  *Id.* at ¶83.  Ms. Hock opposed Mr. Santo's appointment because he was previously married to a member of District 51's HR team who had personally worked with Ms. Hock during her employment issues.  *Id.* at ¶84.  Unlike the questionnaire, she made her objections known to District 51, both before and at the start of the hearing.  *Id.* at ¶¶85–86.  However, neither District 51 nor Mr. Santo granted her request for recusal.  *Id.* at ¶86.

The hearing took two days, starting on August 16, 2016 and concluding on August 24. *Id.* at ¶¶86–87.  Little information is alleged about the hearing except that the Pear Park principal testified.  According to plaintiff, the principal stated that "he was aware that Ms. Hock needed to have a knee replacement, but despite this, he placed her into the SPED Paraprofessional position, which was a position that had very physically demanding requirements."  *Id.* at ¶88; Plaintiff Affidavit, ECF No. 35-1 at ¶83.  On September 2, 2016 Mr. Santo issued his findings in which he affirmed Ms. Hock's dismissal.  ECF No. 11 at ¶89.  Following the decision, Ms. Hock requested the audio recording of the hearing, but District 51 allegedly denied her request.  *Id.* at ¶90.

Ms. Hock filed her charge of discrimination with the Equal Employment Opportunity

---

[1] On May 31, 2016 plaintiff received an updated letter in which District 51 removed the reference regarding her two unsubstantiated workers' compensation claims.  ECF No. 11 at ¶81.

Commission ("EEOC") on September 2, 2016.  *Id.* at ¶92.  But on July 28, 2017 the EEOC

closed its file on her case after finding the charge untimely.  *Id.* at ¶93; Ex. O, ECF No. 39-15.

She received a right to sue letter with her notice of closure.  *See* Ex. O, ECF No. 39-15.  Ms.

Hock then filed her complaint in the district court on September 29, 2017, where she alleged

three claims: (1) disability discrimination under the American with Disabilities Act ("ADA"); (2)

failure to accommodate under the ADA; and (3) violation of the Rehabilitation Act.

## II.  SUMMARY JUDGMENT STANDARD OF REVIEW

The Court may grant summary judgment if "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The

moving party has the burden to show that there is an absence of evidence to support the

nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The nonmoving

party must "designate specific facts showing that there is a genuine issue for trial."  *Id*. at 324.  A

fact is material "if under the substantive law it is essential to the proper disposition of the claim."

*Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty

Lobby, Inc*., 477 U.S. 242, 248 (1986)).  A material fact is genuine if "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

The Court will examine the factual record and make reasonable inferences therefrom in the light

most favorable to the party opposing summary judgment.  *Concrete Works of Colo., Inc. v. City

& Cty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).

## III.  ANALYSIS

Defendant raises five arguments in its motion: (1) that plaintiff's ADA and Rehabilitation

Act claims fail because she did not timely file a charge of discrimination with the EEOC; (2) that

the scope of her charge of discrimination fails to include a claim of discrimination against the

hearing officer; (3) that plaintiff's reasonable accommodation claims are barred because she refused to participate in the interactive process; (4) that defendant had legitimate, nondiscriminatory reasons for terminating plaintiff's employment; and (5) that there is no evidence that the hearing officer discriminated against plaintiff. I address each argument in turn.

## A. The Timeliness of Plaintiff's Charge of Discrimination With the EEOC.

Defendant argues that plaintiff's ADA and Rehabilitation Act claims fail because plaintiff did not exhaust her administrative remedies. ECF No. 30 at 8. Plaintiff argues that she did exhaust her administrative remedies for her ADA and Rehabilitation Act claims, but even if she did not, plaintiff asserts that exhaustion is not required under the Rehabilitation Act. ECF No. 35 at 6–12. Because I agree with plaintiff's latter argument (but not her former argument), I will address the ADA exhaustion requirements before turning to the relevant statute of limitations governing the Rehabilitation Act claim.

### 1. ADA Exhaustion Requirements.

The ADA incorporates Title VII's procedural requirements. *See* 42 U.S.C. § 12117(a); *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1183 (10th Cir. 2003). One of those requirements is contained in 42 U.S.C. § 2000e-5(e)(1), which governs the requirements of filing a charge of discrimination with the EEOC. Section 2000e-5(e)(1) states that the "charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred." For almost forty years, the Tenth Circuit held that the plaintiff's failure to timely file a charge divested a district court of jurisdiction. But in August 2018, the Tenth Circuit reversed course, holding that "a plaintiff's failure to file an EEOC charge regarding a discrete employment incident merely permits the employer to raise an affirmative defense of failure to exhaust but does not bar a federal court from assuming jurisdiction over a claim."

*Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1181 (10th Cir. 2018). "In most cases, including this one, this distinction between a jurisdictional requirement and an affirmative defense is immaterial." *Smith v. Cheyenne Ret. Inv'rs L.P.*, 904 F.3d 1159, 1164 (10th Cir. 2018).

Here, the undisputed facts show that defendant terminated plaintiff on May 27, 2016, and that plaintiff filed her charge with the EEOC on May 2, 2017—339 days after her termination. Plaintiff attempts to avoid this timeliness issue by raising the continuing violation doctrine.[2] ECF No. 35 at 6. Specially, she argues that her charge "has always been based on a pattern of discrimination by Defendant that subjected her to a hostile work environment, both during her employment and following her termination." *Id.* For support, plaintiff cites *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002). *Id.*

It is true that *Morgan* held that hostile work environment claims accrue each time an act contributing to the overall "unlawful employment practice" occurs. *Morgan*, 536 U.S. at 117–18. It is also true that the continuing violation doctrine is applicable solely in hostile work environment claims. *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 632 (10th Cir. 2012) (noting that *Morgan* rejected the continuing violation doctrine for claims involving discrete acts).

---

[2] To proceed under a continuing violation theory, a plaintiff must show either that "(1) a series of related acts was taken against him, with one or more of those acts occurring within the limitations period, or (2) the defendant maintained a company-wide policy of discrimination both before and during the limitations period." *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1183–84 (10th Cir. 2003). Plaintiff only alleges the former in this case.

> In analyzing whether alleged discriminatory acts are sufficiently related to constitute a continuing violation or whether such acts are discrete acts which must be regarded as individual violations, we have used a three-part inquiry to determine whether there was a continuing violation: (i) subject matter—whether the violations constitute the same type of discrimination; (ii) frequency; and (iii) permanence—whether the nature of the violations should trigger an employee's awareness of the need to assert her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate.

*Id.* at 1184 (internal quotation marks and citations omitted).

Thus, under these theories, an employer may be liable for all acts contributing to the practice so long as the employee files a charge within 300 days of any act that is part of the hostile work environment. *Id.* at 118. The premise of these employment discrimination theories is "the equitable notion that the statute of limitations should not begin to run until a reasonable person would be aware that his or her rights have been violated." *Davidson*, 337 F.3d at 1184.

By contrast, *Morgan* affirmed the Court's longstanding precedent that "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire" constitute "separate actionable 'unlawful employment practice.'" *Morgan*, 536 U.S. at 114. Accordingly, so long as the employee has notice of a discrete adverse employment action, the statute of limitations is triggered on the day the discrete act occurs. *See Almond v. Unified Sch. Dist. No. 501*, 665 F.3d 1174, 1178 (10th Cir. 2011) (citing *Morgan*, 536 U.S. at 114).

With that framework in mind, I must decide whether the complained of acts constitute one continuing violation or separate, discrete acts. Plaintiff specifically lists four acts that make up her hostile work environment claim: (1) multiple involuntary and inappropriate job placements; (2) defendant's failure to work with plaintiff on reasonable accommodations; (3) defendant's failure to allow her to return to work after she provided medical information confirming her ability to return immediately with accommodations; and (4) defendant's failure to appoint a new hearing officer after she raised impartiality concerns. ECF No. 35 at 7. In addition to these four, she also challenges her termination.

Using the four examples of discrete acts listed in *Morgan* as guideposts, to me, it is beyond dispute that the five acts plaintiff complains of are discrete acts. *See Morgan*, 536 U.S. at 114 (listing termination, failure to promote, denial of transfer, and refusal to hire as examples of discrete acts). To start, defendant's decision to transfer plaintiff and place her in an

inappropriate position is akin to a denial of transfer, making these discrete acts. The day she received notice that she would be involuntarily transferred to Pear Park Elementary, or that her request to transfer back to Bookcliff Middle School (if she made one) was denied, her 300-day limitations period started to run. Likewise, defendant's failure to allow her to return to work is similar to the discrete act of refusal to hire. Finally, plaintiff's termination needs no explanation—this is a discrete act.

The only two complained of acts that don't fit neatly into one of the four examples listed in *Morgan* is defendant's alleged failure to accommodate her physical restrictions and defendant's refusal to replace Mr. Santo as the hearing officer. But these events too occurred at specific points in time. For example, plaintiff alleges that she raised concerns that she could not fill the role of kindergarten classroom professional due to her physical limitations prior to the 2014–2015 school year. ECF No. 11 at ¶39. She claims that the Pear Park principal assured her that he would accommodate her physical restrictions. *Id.* at ¶40. Thus, even if defendant did not deny her request immediately or that denial was not known to her at that time, she surely would have known by the last day of school year that her needs were not accommodated. Likewise, the evidence shows that defendant denied plaintiff's request to replace Mr. Santo, both before and during the hearing. ECF No. 35-1 at ¶¶81–82. The day she received these denials constituted discrete acts.

Because "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act," *Morgan*, 536 U.S. at 113, any act that occurred more than 300 days prior to plaintiff filing her charge is time-barred. Here, that includes all acts prior to and including her termination. The only act that occurred within her 300-day window is defendant's refusal to replace Mr. Santo as the hearing officer. Therefore, unlike the remainder of plaintiff's alleged

wrongful acts in violation of the ADA, this is the sole act that is not time-barred by the 300-day limitations period.

 2. <u>Statute of Limitations Governing Plaintiff's Rehabilitation Act Claim</u>.

 As I stated above, plaintiff argues that, under the facts of this case, exhaustion is not required under the Rehabilitation Act.  Defendant appears to concede this point in its reply.  *See* ECF No. 38 at 2–3.  Section 504(a) of the Rehabilitation Act, codified at 29 U.S.C. § 794(a), provides that

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

Under the Rehabilitation Act, when the defendant is not a federal employer, the remedial scheme in Title VI, which does not require exhaustion, controls.  *See Ryan v. Shawnee Mission Unified Sch. Dist. No. 512*, 437 F. Supp. 2d 1233, 1254 (D. Kan. 2006) (citing § 505(a)(2), codified at § 794a(a)(2)); *see also Skyfire v. ServiceSource, Inc.*, No. 10-CV-03155-WYD-BNB, 2012 WL 4329025, at *7 (D. Colo. Sept. 20, 2012) ("[A] suit under Section 504 of the Rehabilitation act, against an employer who receives federal funds rather than a federal employer, does not require exhaustion.").  In contrast, when the defendant is a federal employer, the remedial scheme in Title VII applies.  *Skyfire*, 2012 WL 4329025, at *7 (citing 29 U.S.C. § 794a(a)(1)).

 Here, after conceding its exhaustion argument with respect to plaintiff's Rehabilitation Act claim, defendant reduced its argument to a simple statute of limitations argument.  Defendant asks the Court to bar any alleged discriminatory acts that occurred prior to September 29, 2015.  ECF No. 38 at 2.  Because both sides agree that the applicable statute of limitations on

this claim is two years, I grant defendant's request.  Accordingly, any discrete employment act that occurred prior to September 29, 2015 are barred.

## B.  The Scope of Plaintiff's Charge of Discrimination.

Defendant's next argument is that plaintiff's charge of discrimination does not indicate the existence of a disability discrimination claim based on defendant's appointment of and refusal to disqualify the hearing officer, Mr. Santo.  ECF No. 30 at 11.  As such, defendant believes that plaintiff failed to exhaust her administrative remedies on this claim.  *Id.*

A "plaintiff's claim in court is generally limited by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC."  *Smith v. Cheyenne Ret. Inv'rs L.P.*, 904 F.3d 1159, 1164 (10th Cir. 2018) (quotation omitted).  Put another way, a plaintiff must describe her challenged unlawful employment practice in her administrative charge by including facts concerning each claim.  *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1166 (10th Cir. 2007).  While the Tenth Circuit "liberally construe[s] [a] plaintiff's allegations in the EEOC charge, the charge must contain facts concerning the discriminatory and retaliatory actions underlying each claim[.]"  *Smith*, 904 F.3d at 1164 (quotation omitted); *see also Montes*, 497 F.3d at 1166 (noting that the standard governing the written statement in the charge "is not demanding").

One of the purposes of requiring sufficiently alleged facts is so "those facts would prompt an investigation of the claim."  *Jones v. U.P.S., Inc.*, 502 F.3d 1176, 1186 (10th Cir. 2007) (quoting *Jones v. Sumser Ret. Vill.*, 209 F.3d 851, 853 (6th Cir. 2000)).  Another purpose is to "notify potential defendants of the nature of plaintiff's claims and provide them the opportunity to settle the claims before the EEOC rather than litigate them."  *Sumser Ret. Vill.*, 209 F.3d at 853 (quotation omitted).  "A complainant need not attach the correct legal conclusion to

allegations in the charge, conform to legal technicalities, or use the exact wording which might be required in a judicial pleading." *Id.* (internal quotations omitted).

While the specificity in plaintiff's charge leaves something to be desired, based on a liberal reading of plaintiff's charge, I am convinced that she included adequate facts to challenge defendant's alleged discriminatory acts concerning her internal appeal. To illustrate, she stated that "I ultimately appealed this decision, per District 51's policies, but the hearing officer for this appeal, who had a previous relationship with a member of District 51's Human Resources Department that had worked on my matter, ultimately agreed to the termination of my employment on September 2, 2017. *See also* my Affidavit, incorporated herein by reference." Ex. N, ECF No. 30-14 at 2. Her affidavit describes her attempts to disqualify Mr. Santo due to his conflicts of interest. *See* ECF No. 35-1 at ¶¶78–85. Her affidavit further states that she requested the audio recording of the hearing, but defendant refused to turn them over. *Id.* at ¶85. Finally, I note that in the required box titled "date discrimination took place," plaintiff indicated that the latest discrimination occurred on September 2, 2016—the day Mr. Santo issued his finding. ECF No. 30-14 at 1.

These facts, taken as a whole, should have been enough to prompt an investigation and notify potential defendants that she challenged Mr. Santo's appointment. As such, I find that her charge described the challenged claim concerning defendant's alleged discriminatory conduct before, during, and after her appeal hearing.

### C.  Plaintiff's Participation in the Reasonable Accommodation Interactive Process.

The next issue raised in defendant's motion is which side is responsible for the breakdown in communications concerning reasonable accommodations. Defendant blames plaintiff and claims that she failed to meaningfully engage in the interactive process. ECF No.

30 at 14. Plaintiff argues that defendant refused to cooperate, and that defendant acted in bad faith throughout the interactive process. ECF No. 35 at 13.

"The federal regulations implementing the ADA envision an interactive process that requires participation by both parties." *Smith v. Midland Brake, Inc., a Div. of Echlin, Inc.*, 180 F.3d 1154, 1171 (10th Cir. 1999) (en banc) (quotations omitted). The Rehabilitation Act also requires an interactive process for reasonable accommodate requests. *See Wilkerson v. Shinseki*, 606 F.3d 1256, 1266 (10th Cir. 2010). "The interactive process is mandatory and requires both parties to engage in good faith." *United States v. Dental Dreams, LLC*, 307 F. Supp. 3d 1224, 1251 (D.N.M. 2018). The process begins with an employee notifying the employer of the employee's disability and the resulting limitations. *Smith*, 180 F.3d at 1171. If the employer is unable to accommodate, the two sides should discuss the possibility and willingness of the employee to be reassigned to a new position. *Id.* at 1172. Once the employer is on notice, both parties have an obligation to communicate in good faith to determine whether the employee would be qualified for another position within the organization if she cannot continue in her current role. *Id.* "A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith." *Id.* (quoting *Beck v. Univ. of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996)).

Here, defendant's argument rests on the fact that plaintiff refused to complete the medical questionnaire provided by defendant. ECF No. 30 at 14. According to defendant, the knee injury that plaintiff sustained while working prevented her from performing the essential functions of her SpEd paraprofessional position. *Id.* at 15. So, both sides met on November 12, 2015 to discuss accommodations. *Id.* Defendant claims that they agreed at that meeting that it

would prepare a questionnaire for plaintiff's physician to complete to assist both sides in evaluating the appropriate accommodations. *Id.* Defendant goes on to claim that plaintiff refused to complete the questionnaire or provide any information requested in the questionnaire. *Id.* Defendant emphatically states that "[s]he did not request any reasonable accommodation from the District at any time before the termination of her employment on May 27, 2016. After receipt of the questionnaire, Hock simply quit communicating with the District." *Id.* at 16.

Plaintiff argues that defendant issued the questionnaire in bad faith. ECF No. 35 at 14. She claims that defendant had no right to ask about her mental impairments when her disability concerned only her left knee. *Id.* Next, she claims that she had already provided the necessary information regarding her disability and limitations on several occasions, and thus, defendant's repeated requests for the same information was simply a stall tactic. *Id.*

Here, there is no dispute that plaintiff initiated the interactive process. The issue is whether I can determine as a matter of law which party is responsible for the breakdown in communications. Based on the conflicting summary judgment evidence, I cannot make that determination. Plaintiff's affidavit states that she provided a doctor's note on September 2, 2015 to the Pear Park principal that included her physical restrictions and estimated recovery time. *See* ECF No. 35-1 at ¶59. Yet on September 3, Michelle Wilcox from HR contacted plaintiff asking for an updated doctor's note. *Id.* A reasonable factfinder could find that defendant acted in bad faith by requesting information that it already had in its possession. On the other hand, a reasonable factfinder could determine that plaintiff's unresponsiveness to defendant's repeated request for information caused the breakdown, especially because there is no indication that she

ever voiced her objections regarding the mental health question. Either way, this question is better left to the jury.[3]

**D. Defendant's Legitimate, Nondiscriminatory Reasons for Plaintiff's Termination.**

Defendant's fourth argument avers that plaintiff's ADA and Rehabilitation Act claims fail because defendant had legitimate, nondiscriminatory reasons for terminating plaintiff's employment. ECF No. 30 at 16. Specifically, defendant's May 27, 2016 "notice of dismissal" letter stated two reasons for her termination: that plaintiff had not reported for duty since August 6, 2015; and that while on leave, plaintiff repeatedly failed to timely respond to requests for information regarding her physical restrictions and approximate date of return. ECF No. 30-12 at 1. Plaintiff responds by arguing that defendant's stated reasons for her termination were mere pretext because she has shown that she did comply with defendant's request for information but was prevented from returning to work. ECF No. 35 at 17.

In cases such as this where there is no direct evidence of discrimination, a court uses the burden-shifting framework first announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) to evaluate ADA and Rehabilitation Act claims. *Lincoln*, 900 F.3d at 1192 (ADA); *Cummings v. Norton*, 393 F.3d 1186, 1189 n.1 (10th Cir. 2005) (Rehabilitation Act). The first step requires plaintiff to satisfy a prima facie case of discrimination. *Id.* To establish a prima facie case under the Rehabilitation Act, plaintiff must satisfy four elements: "(1) that the plaintiff

---

[3] I note that my ruling on this issue is limited to plaintiff's Rehabilitation Act claim because I already granted summary judgment in defendant's favor on plaintiff's reasonable accommodation claim under the ADA. However, the ADA "does not bar an employee from using time-barred acts as background evidence in support of a timely claim." *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1184 n.2 (10th Cir. 2003) (citing *Morgan*, 536 U.S. at 113). Therefore, when plaintiff attempts to show that defendant discriminated against her by allegedly selecting a biased hearing officer and then refusing to replace him, plaintiff is free to argue that defendant has a history of acting in bad faith when dealing with her disability. Likewise, defendant is free to argue that it continually sought medical information from plaintiff in a good-faith effort to accommodate her physical limitations and thus has a history of acting in good faith.

is disabled under the Act; (2) that [s]he would be 'otherwise qualified' to participate in the program; (3) that the program receives federal financial assistance (or is a federal agency); and (4) that the program has discriminated against the plaintiff." *McGeshick v. Principi*, 357 F.3d 1146, 1150 (10th Cir. 2004). If plaintiff establishes a claim of discrimination, the burden shifts to defendant to articulate a "legitimate, nondiscriminatory reason" for the adverse employment action. *Lincoln*, 900 F.3d at 1193 (quoting *McDonnell Douglas*, 411 U.S. at 802). If defendant can satisfy its burden, the burden shifts back to plaintiff who must demonstrate that the stated reason was pretextual. *Id.* "A plaintiff may show pretext by demonstrating the proffered reason is factually false, or that discrimination was a primary factor in the employer's decision." *Id.* (internal quotation marks omitted). "This is often accomplished by revealing weakness, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence." *Id.* (internal quotation marks omitted).

Although it's not at all clear that plaintiff can satisfy each element, for summary judgment purposes, defendant doesn't contest that plaintiff advances a prima facie case of discrimination. *See* ECF No. 30 at 17. Instead, defendant asks me to rule that its stated reasons for termination were legitimate and nondiscriminatory. This I cannot do. Defendant did not fire plaintiff for poor performance. It fired her for not returning to work following her injury, and for failing to respond to the medical questionnaire. Both reasons are directly related to her disability. Plaintiff has offered a plausible argument that she did respond to defendant's inquiry, and that defendant's actual reason for her termination was because of her physical disabilities. Because there are clear issues of material dispute concerning the actual reason for plaintiff's termination, this issue is better suited for the jury.

### E.  **Proffered Evidence that Mr. Santo Discriminated Against Plaintiff.**

Defendant argues that plaintiff cannot show that District 51 or Mr. Santo discriminated against her because of her disability at her termination appeal.  ECF No. 30 at 18.  In response, plaintiff maintains that she has presented more than enough evidence to give rise to an inference that defendant's decision to appoint Mr. Santo was because of plaintiff's disability.  ECF No. 35 at 18.  I agree with plaintiff.

To establish a prima facie case under the ADA, plaintiff must show "(1) that [s]he is disabled within the meaning of the ADA; (2) that [s]he is qualified for the job held or desired; and (3) that [s]he was discriminated against because of [her] disability."  *Lincoln*, 900 F.3d at 1192 (internal citations and quotations omitted).  Defendant disputes only the third element.[4]

To properly analyze the third element, my "inquiry focuses on whether the circumstances surrounding the adverse employment action give rise to an inference that the [action] was based on [the plaintiff's] disability."  *Id.* at 1192–93 (internal citations and quotations omitted) (alterations in original).  Plaintiff can establish an inference of discriminatory motive in a variety of ways.  One way plaintiff could establish an inference of discriminatory motive is to offer facts showing that defendant's actions "could be viewed as reflecting a discriminatory animus."  *Id.* at 1193 (quoting *Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005)).  Plaintiff must present some evidence that her disability was a determining factor for defendant's selection of Mr. Santo, but this burden of production "is not onerous."  *Id.*

Here, defendant does not dispute that Mr. Santo was previously married to Ms. Podgorny, a member of defendant's HR team.  Defendant also does not dispute that Ms. Podgorny worked

---

[4] Defendant does not address the prima facie elements of a Rehabilitation Act claim in this argument.  Although the elements are slightly different, *see Taylor v. Colorado Dep't of Health Care Policy & Fin.*, 811 F.3d 1230, 1233 (10th Cir. 2016), like in *Taylor*, this argument involves an element common to both the ADA and Rehabilitation Act—whether defendant's actions were discriminatory.  *Id.*

on plaintiff's case, including her participation in preparing plaintiff's FRISK notices, her performance reports, and her termination. Instead, defendant simply replies by stating, "Hock fails to offer any evidence that would give rise to an inference that the District's refusal to disqualify the hearing officer was based on Hock's disability." ECF No. 38 at 3.

Defendant's argument, or lack thereof, is unpersuasive. A reasonable factfinder could conclude that defendant's selection of Mr. Santo to serve as the hearing officer was in some way motivated by plaintiff's disability and her turbulent work history (allegedly caused by her disability) over the previous two years. There must be dozens—perhaps hundreds—of qualified attorneys in Grand Junction and the surrounding area. Defendant makes no attempt to argue that Mr. Santo was especially suited for this appeal or that Mr. Santo handles all appeals for defendant. In sum, plaintiff has satisfied her light burden to establish an inference of discriminatory motive on defendant's part.

## IV. CONCLUSION

Plaintiff may proceed on her ADA disability discrimination claim concerning defendant's conduct surrounding her termination appeal. Besides that small sliver, summary judgment is granted for plaintiff's first claim for relief—disability discrimination under the ADA—because plaintiff failed to exhaust her administrative remedies. The same is true for plaintiff's second claim for relief—failure to provide reasonable accommodations under the ADA. Summary judgment is granted in full on this claim as failure to accommodate bears no direct relation to defendant's handling of plaintiff's appeal. Finally, plaintiff's third claim for relief—violation of the Rehabilitation Act—survives. However, any act that occurred prior to September 29, 2015 is not actionable because it is barred by the two-year statute of limitations.

**ORDER**

Defendant's motion for summary judgment, ECF No. 30, is GRANTED in part and

DENIED in part.

DATED this 13th day of May, 2019.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge